## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN AT GREENBAY

| | | |
|---|---|---|
| WILBUR C. TRAFTON, | ) | NO. 08-C-0099 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROCKETPLANE KISTLER, INC., | ) | |
| ROCKETPLANE LIMITED, INC., | ) | |
| ROCKETPLANE, INC., FRENCH | ) | |
| PROPERTIES L.L.C. AND GEORGE | ) | |
| D. FRENCH JR., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| RANDOLPH H. BRINKLEY, | ) | NO. 08-C-0642 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROCKETPLANE KISTLER, INC., | ) | |
| ROCKETPLANE LIMITED, INC., | ) | |
| ROCKETPLANE, INC., FRENCH | ) | |
| PROPERTIES L.L.C. AND GEORGE | ) | |
| D. FRENCH JR., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF WILBUR C. TRAFTON

Wilbur C. Trafton declares as follows:

1

1.	My name is Wilbur Trafton. I am a plaintiff in one of the above-captioned matters and make the following statements from personal knowledge.

2.	I am a 1966 graduate of the United States Naval Academy. I retired as a Captain in the United States Navy in 1992. My curriculum vitae which is attached hereto as Exhibit 1 provides a more detailed summary of my education and military, civilian government, and business careers.

3.	In August 2004 I was hired by Kistler Aerospace Corporation based in Seattle, Washington as its President and Chief Operating Officer. I reported directly to Randolph Brinkley, CEO for Kistler, who was hired at the same time as I was to help Kistler out of Chapter 11 bankruptcy and to position it to compete for a funded Space Act Agreement (SAA) with the National Aeronautics and Space Administration (NASA) under its Commercial Orbital Transportation System (COTS) initiative.

4.	In early 2006 investors of Kistler entered into discussions with defendant George French about French joining the company as a major shareholder. After Mr. French took a majority ownership position in Kistler, discussions commenced about merging Kistler with a corporation owned by George French, Rocketplane Limited, Inc., to enhance the prospects of winning the NASA funded SAA award.

5.	While the merger talks were ongoing Ken Morrow, the attorney for Mr. Brinkley and me, entered into negotiations with lawyers from the Seattle law firm of Davis Wright Tremaine for employment contracts for the two of us with the merged companies.

6.	On about June 23, 2006 the employment agreement, effective June 1, 2006 was executed. A true copy of my Employment Agreement is attached hereto as Exhibit 2.

2

7. Prior to entering into the agreement with Kistler Aerospace Corporation and Rocketplane Limited, Inc., effective June 1, 2006, I had been working for Kistler in accordance with a Consulting Agreement since September 2005 when Kistler's then majority shareholder, Bay Harbor Properties, LLC, refused to continue funding Kistler. My responsibilities included continuing to position first Kistler and then Kistler and Rocketplane Limited, jointly, to win the NASA funded SAA award.

8. On August 18, 2006 NASA awarded one of two funded Space Act Agreements to Kistler and Rocketplane Limited.

9. On about October 31, 2006 Kistler and Rocketplane Limited consummated their merger negotiations and I continued working for the new entity, Rocketplane Kistler, Inc. (RpK), as contemplated in the Employment Agreement.

10. My job responsibilities as Executive Vice-President, Business Development, the position to which I was elected at RpK, included supporting the President and CEO, representing the President and CEO when directed, oversight of all marketing and sales efforts, directing the activities of the Vice-President for Sales and administrative staff, including consultants, and representing the company in the public domain including conferences and symposiums. Most of my efforts were directed at and my primary responsibilities were marketing the K-1 project, a reusable orbital launch system developed by Kistler. I also had some responsibilities for marketing the XP, a sub-orbital vehicle for Rocketplane Limited, Inc.

11. RpK's officers spent a considerable amount of time during the early and middle part of 2007 seeking investors and customers. However, by mid-2007 potential

3

investors began to retreat and RpK was unable to meet its financial expectations, creating a severe cash flow problem.

12.    On Wednesday, August 22, 2007 I received a telephone call from George French. Mr. French said "I am letting you go." He said that he was also terminating most of my staff. He told me that the decision to terminate us was made for financial reasons. I responded by saying that "you know, George, this triggers the severance provision in my Employment Agreement." Mr. French said "I know."

13.    On Thursday, August 23, 2007, George French called me and said that he had found some money and that he was rehiring me. I told him that now that I had been fired the decision whether to accept being rehired was mine and that I did not want to return to work under the circumstances that existed. Those circumstances included the fact that no one on my staff was going to be rehired. I reiterated that the severance provision of my Employment Agreement had been triggered and Mr. French again acknowledged that he understood that.

14.    Later in the day I sent Mr. French a letter confirming our conversation, indicating to him that his actions allowed me to resign for good cause as set forth in the Agreement and that I was entitled to the severance benefits as I enumerated in that letter. My August 23 letter is attached hereto as Exhibit 3.

15.    Having received no response to my August 23 letter, and certainly not having received any of the severance benefits to which I was entitled, I directed my attorney to send a demand letter to counsel for RpK. He did so on October 23, 2007. That letter is attached hereto as Exhibit 4. (The attachments referenced in the letter are not included here as they are already attached as Exhibits 2 and 3.) We received no

4

response from counsel for RpK to that letter. However, in early November I received an undated letter from Mr. French informing me that it was the company's position that I resigned for other than good cause and that I was not entitled to severance. That letter is attached hereto as Exhibit 3.

16.     As of the date of this declaration I have not received any of the severance benefits to which I am entitled in accordance with my June 1, 2006 Employment Agreement. Based on my employment agreement I should have received $260,000.00 in equal installments over the year following my resignation. Neither have I received $27,500.00 in deferred pay for the months of June, July and August 2007, nor were my medical insurance premiums totaling about $5,000.00 paid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated at _CORONADO, CA_ , this _30_$^{7H}$ day of June, 2009.

Wilbur C. Trafton

5