UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN AT GREENBAY

| | | |
|---|---|---|
| WILBUR C. TRAFTON, | ) | NO. 08-C-0099 |
| Plaintiff, | ) | |
| v. | ) | |
| ROCKETPLANE KISTLER, INC., ROCKETPLANE LIMITED, INC., ROCKETPLANE, INC., FRENCH PROPERTIES L.L.C. AND GEORGE D. FRENCH JR., | ) | |
| Defendants. | ) | |
| RANDOLPH H. BRINKLEY, | ) | NO. 08-C-0642 |
| Plaintiff, | ) | |
| v. | ) | |
| ROCKETPLANE KISTLER, INC., ROCKETPLANE LIMITED, INC., ROCKETPLANE, INC., FRENCH PROPERTIES L.L.C. AND GEORGE D. FRENCH JR., | ) | |
| Defendants. | ) | |

**PLAINTIFFS TRAFTON'S AND BRINKLEY'S REPLY TO DEFENDANTS' RESPONSE TO THEIR BRIEF IN SUPPORT OF THEIR MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

1

# I. DEFENDANTS RELIANCE ON JAMES STUART IS MISPLACED AS HIS TESTIMONY ABOUT THE EMPLOYMENT AGREEMENTS AND SPACE ACT AGREEMENT IS INADMISSABLE.

Mr. Stuart, a member of defendants' boards of directors, testified in his deposition:

> Q   Okay. I'm going to show you what's previously been marked as Exhibit 3 in the discovery, and I'll represent to you that it's Will Trafton's Employment Agreement. Have you seen this document before?
>
> A   No.
>
> Q   Would you flip the pages and get to Exhibit 19? . . .
>
> A   19. Yes.
>
> Q   And I'll represent to you that it is Randy Brinkley's Employment Agreement. Have you ever seen that?
>
> A   No.
>
> . . .
>
> Q   Okay. Do you know whether there was an award by NASA under the COTS initiative?
>
> MS. HOOKER: I'm going to object to the extent that it calls for a legal conclusion based on foundation.
>
> Q   [BY MR. ROSEN] Okay. You can still answer.
>
> A   It's my understanding since we received funds from NASA that there must have been a contract consummated. I have never seen it. I didn't deal with it, but I do know that we had progress payments awarded to us from NASA. So I assume that we had consummated a contract.

Rosen Second Supplemental Declaration, ¶ 2, Exhibit 1 (Stuart Deposition, 24:4-29:21). Mr. Stuart acknowledges during this colloquy that while he had some initial

2

discussions with plaintiffs about the "concepts" to the employment agreements, he had never gotten to the point of drafting any language.

> We were just verbally talking. We didn't have, for example, anything about termination – I was just – I had only done the most – the most rudimentary beginning on, lets agree on the form of your compensation. . . . And before I had a chance to circle around with anybody else and come back with something in writing, I was told that there – it was going to continue on with somebody else. Not that I had done a bad job, just that it was – the details would be handled by someone else.

Stuart Dep., 27:16-28:8. Based on these admissions, none of Mr.. Stuart's testimony on which defendants rely is admissible evidence. It is speculation, it is hearsay, and it lacks foundational support. Defendants cannot rest on this testimony in an attempt to defeat summary judgment. *Doe v. RR Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir., 1994) ("In this respect, the non-moving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position.") (citations omitted).[1]

## II. THE EMPLOYMENT AGREEMENTS ARE NOT AMBIGUOUS BUT EVEN IF THEY WERE SUMMARY JUDGMENT AGAINST ALL DEFENDANTS ON THE BREACH OF CONTRACT CLAIMS IS WARRANTED.

A. The Court can and should consider extrinsic evidence to determine intent.

"A contract is ambiguous if its terms are uncertain or they may be subject to more than one meaning. A provision is not ambiguous simply because the parties suggest opposing meanings." *Dice v. City of Montesano*, 131 Wn. App. 675, 684, 128 P.3d 1253 (Div. 2, 2006), rev. denied, 158 Wn.2d 1017 (2006), citing *Mayer v. Pierce*

---

[1] "Although state law provides the substantive law in a diversity action, summary judgment procedure is governed by federal law. Federal law defines the standard for evaluating the sufficiency of the evidence." *Maroules v. Jumbo, Inc.*, 452 F.3d 639, 645 (7th Cir., 2006) (citations omitted).

3

*County Medical Bureau*, 80 Wn. App. 416, 421, 909 P.3d 1323 (Div. 2, 1995).

Under Washington law a court should "not read an ambiguity into a contract that is otherwise clear and unambiguous." *Dice* at 684, citing *Mayer v. Pierce County Medical Bureau* at 420. Contract interpretation is only a question of law when "(1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence." *Dice* at 684, citing *Tanner Electric Corp. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996).

"If a contract can reasonably be interpreted two ways, one of which is ambiguous and one of which is not, the latter interpretation should be adopted when each clause can be given effect." *Dice* at 685, citing *St. Yves v. Mid-State Bank*, 111 Wn.2d 374, 378, 757 P.2d 1384 (1988), overruled on other grounds in *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990). Plaintiffs agree with defendants that determining the parties' intent is a primary goal. See Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 5 (Document #66). They also agree with defendants that the parties' intent will be determined "from reading the contract as a whole." *Id.* However, defendants' conclusion that paragraph 5(h) of the agreements creates an ambiguity that cannot be resolved except by a trier of fact is not supported when the agreements are read as a whole or when the circumstances surrounding their making and the subsequent acts and conduct of the parties are viewed together.[2]

*Dice v. Montesano* involved a claim similar to those brought here. Dice, the public works director for the City of Montesano, had a contract that provided for severance pay if he was terminated without cause. It also had a duration clause that

---

[2] The court may review extrinsic evidence to aid in the determination of the parties' intent in an unambiguous contract. *Berg v. Hudesman, supra* at 666-67.

4

ran from year-to-year. The City notified Dice that it planned to terminate his employment effective on the anniversary date of the contract. It refused to pay his three months severance pay claiming that since it simply did not renew the agreement it was relieved of the severance obligation. Dice sued for breach of contract and for the willful withholding of wages. The trial court awarded summary judgment on the contract claim but denied his claim for double damages finding that there was no willfulness. The court of appeals affirmed summary judgment for Dice on the contract claim and reversed the trial court's denial of double damages, finding that by ignoring the unambiguous language of the employment agreement the city acted willfully. *Dice* at 688. It remanded it for a determination and award of additional fees and costs.

B. <u>A review of the language of the agreements, the context in which they were negotiated, and the conduct of the parties, both before and after the negotiations, confirms that paragraph 5(h) does not have the meaning ascribed to it by defendants.</u>

Under the interpretation of paragraph 5(h) that defendants urge on the court, neither Trafton nor Brinkley would be entitled to severance pay until after the date it was expected that the Company would receive the full $200 million from NASA. That date is August 2012, three years after the expiration date set forth in paragraph 1(a) at page 1 of the employment agreements.[3] This August 2012 date is set forth at page 53 of the NASA Space Act Agreement. Exhibit 3 to the Declaration of

---

[3] The complete language in the Employment Agreements regarding termination is as follows:
> The term of employment of Executive under this Agreement shall begin June 1, 2006 (the "<u>Effective Date</u>") and continue until the earliest to occur of (i) thirty (30) days after completion of the K-1 COTS demonstration flight, (ii) the third anniversary of the Effective Date, or (iii) a termination pursuant to Section 5 hereof (the "<u>Initial Term</u>"). Thereafter, this Agreement will automatically renew for an additional one (1) year period until terminated by either party upon not less than thirty (30) days by written notice.

See Trafton and Brinkley Declarations, Exhibits 2 (Document ## 53 and 54). The K-1 COTS demonstration flights were scheduled in the Space Act Agreement to occur in January and March, 2009. Brinkley Declaration, Exhibit 3, p. 49. *Id.*

5

Randolph H. Brinkley filed on June 30, 2009 (Document # 54).

Mr. French signed the Space Act Agreement on June 15, 2006. *Id.* at p. 29. June 15, 2006 was shortly prior to the date the parties actually executed the employment agreements. Trafton Declaration, ¶ 6 (Document #53); Second Supplemental Declaration of Jon Howard Rosen, ¶ 2, Exhibit 1.

Exhibit 1 to Rosen's Second Supplemental Declaration is a series of emails between plaintiffs' attorney, Ken Morrow, and defendants attorney, Bob Blackstone, all dated on June 16, 2006, the day after Mr. French signed the Space Act Agreement. Mr. Blackstone authenticated the emails in his deposition. Rosen Second Supplemental Declaration, ¶ 3, Exhibit 2, Blackstone Dep., pp. 20:10-21:19.

Hence it is clear that the parties were all aware prior to the time the employment agreements were executed that if NASA awarded the Company the Space Act Agreement the funds would be paid to the Company in stages extending out more than six years. It is unreasonable, even absurd, to interpret paragraph 5(h) as to mean that the entire $200 million would have to be received before there was any entitlement to severance. Under this interpretation the severance provision would be effectively deleted from the contract during its entire three year initial term. The court should refuse to reach such an absurd result. See *Dice, supra* at 687 ("And we refuse to reach this absurd result").

Clearly, paragraph 5(h) was intended to be an escape clause for the Company in the event that NASA did not award the Space Act Agreement. It is also crystal clear from the Space Act Agreement that the $200 million was to be received over a six year period, not in a lump sum. The rhetorical questions at page 6 of defendants' memorandum are not themselves apt because they assume that the Space Act Agreement is silent on the question of NASA's obligations. It is not. Articles 17 and

6

19 (at pp. 25-27 of the Space Act Agreement) set forth when NASA can unilaterally terminate the Agreement and the resolution process available to the parties should they have a dispute over the agreement or its termination. NASA would have fulfilled its obligations under the Space Act Agreement by terminating it if the Company did not meet the first milestone that was due in September of 2006, just a month after NASA executed its agreement. Regardless of when NASA notified the Company that it was suspending payments and/or terminating the Space Act Agreement, Trafton and Brinkley would have been entitled to their severance pay and benefits as long as they were terminated without cause or resigned for good reason, and to their deferred salary in any event.

That the parties understood that paragraph 5(h) was a safety valve is further clarified by the fact that they negotiated paragraphs 8(b) and 9(b) into the agreements. See agreements attached as Exhibits 2 to the Declarations of Trafton and Brinkley, at pages 13-14 and 14-15, respectively. These paragraphs read:

> Notwithstanding the foregoing this Section 8 [Section 9] shall terminate on December 31, 2006 if the Company terminates Executive's employment pursuant to Section 5(h).

The two sections, 8 and 9, in which the above provisions appear, are entitled "Non-Interference" and "Noncompetition," respectively. In these sections the Company wrested from Trafton and Brinkley their agreements to (a) refrain from inducing Company employees to leave for other employment and (b) to not compete with the Company. The parties further agreed that those two sections would have no force and effect if the Company terminated Trafton and Brinkley in accordance with paragraph 5(h) on December 31, 2006.

The language in 8(b) and 9(b) is further evidence of the parties' intent that if

7

there was no Space Act Agreement by the end of 2006 the Company could terminate Trafton and Brinkley but without any obligation for severance and if it did so Trafton and Brinkley would not be bound by the restrictive covenants. However, a Space Act Agreement was awarded such that there was no occasion for the Company to invoke paragraph 5(h).

That the defendants knew that they were obligated to pay severance before August 2012 if Trafton and Brinkley were either terminated without cause or resigned for good reason is also corroborated by Craig Dickman in his deposition during which he described a conversation he had with George French prior to the negotiation of the agreements.

> A. I recall us having discussions about the termination clauses that essentially centered on make sure these are the right people because you're going to live with them because you can't afford to terminate them.
>
> Q. When did you have that discussion?
>
> A. I would estimate – I would say it was while this contract was being discussed which was – had to have been in that May/June time frame. I was thinking it was June. This is dated June 1. I thought it was a little bit later than that, but it must have been in a May/June time frame. I was thinking it was June.

Rosen Second Supplemental Declaration, ¶ 4, Exhibit 3, Dickman Dep., pp. 21:21-22:8.

The employment agreements are clear and unambiguous. Even if they are not clear and unambiguous the context is such that there is only one reasonable interpretation: Once the companies merged and the Space Act Agreement was awarded, Trafton and Brinkley were entitled to severance benefits if they were

8

terminated for other than cause or resigned for good reason. Defendants cannot defeat summary judgment based on their argument that the agreements are ambiguous.

### III. DEFENDANTS HAVE FAILED TO CREATE A MATERIAL ISSUE OF FACT OVER WHETHER BRINKLEY RESIGNED FOR GOOD REASON.

Fed.R.Civ.P. 56 at (e)(2) states that:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must – by affidavit or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Here, defendants have not set out specific facts "by affidavit or as otherwise provided" in arguing that Brinkley failed to establish that he had good reason to resign. While they argue that "Mr. Brinkley does not contend that there was a 'material diminution' of his duties or 'an assignment of duties that materially impair his ability to perform the duties normally assigned' to a president or CEO.", p. 8 of Defendants' opposition, they ignore the statement on personal knowledge at paragraph 26 of Brinkley's declaration that "[w]ith the key employees terminated on August 22, 2006, I could no longer perform my normal duties as President. What duties I did have diminished materially after August 22." Further, attached to Brinkley's Declaration, at Exhibits 4 and 5 (Document #54), are letters he sent on September 24, 2007 and November 1, 2007 further outlining the reasons he was resigning for good reason in accordance with his employment agreement.

The actions he enumerated in his two letters included the summary termination of key technical, operating and development personnel without prior consultation with

9

him. He notified the board of directors that "the elimination of personnel and resources necessary to carry out the progress of the Company comprises a material diminution of my duties" and that the remaining duties were inconsistent with those normally assigned to a president and chief operating officer of an aerospace company. He went on to describe the fact that there was an agreement that he would be paid his salary in September 2007 which agreement was never fulfilled by Mr. French and in his November 1 letter refers to the fact that despite his best efforts from the period between his two letters NASA was not going to withdraw its default letter. Brinkley Declaration, Exhibits 4 and 5.

As to the refusal to pay his salary, Brinkley states in his declaration "[f]urther, despite my requests for payment of my salary which had been deferred temporarily, I received no compensation for the period between May and late September 2007."

It is for the defendants to counter that statement by setting out "specific facts showing a genuine issue for trial." They have failed to do so. Nowhere in their opposition papers are there any specific facts to contradict Brinkley's statement in paragraph 23 of his declaration that:

> It was my intent to inform all the employees that the Company would honor its commitment of deferred pay to date and accrued vacation. I also intended to ask each employee to continue to support RpK by deferring salary while the Company sought additional funding. Unfortunately, this planned communication with the RpK employees was superseded by a unilateral decision by Mr. French to terminate many of the employees without notice the afternoon prior to the scheduled call.[4]

---

[4] Moreover, the defendants agree with Brinkley's Finding of Fact 13 which states:
In accordance with the employment agreement Brinkley sent a written notification to the company dated September 24, 2007 that he was terminating his employment under the provision of his agreement that allowed him to resign for good reason.

10

Finally, the references to Mr. Brinkley's declaration in the defendants' response to his Proposed Findings of Fact 14 is taken out of context. As he stated in his deposition, consistent with paragraph 23 of his declaration:

> My intent was to pay off – use the funds – and we had sufficient funds – to pay back all of the – all of the employees who had deferred compensation, which included Mr. Trafton; . . . as well as all of the junior employees who were owed accrued vacation. And I was confident that those individuals would continue to work pro bono for at least another month, as they had in the past, and that's how I wanted to manage the situation. . . .

Brinkley Deposition, 51:16-24. The fuller context of this testimony is attached as Exhibit 5 to the Second Supplemental Declaration of Jon Howard Rosen. Brinkley Deposition, 48:5-58:7.

## IV. DEFENDANTS HAVE FAILED TO INTRODUCE SPECIFIC FACTS JUSTIFYING DENIAL OF THE MOTION FOR SUMMARY JUDGMENT OF THE REMAINING AFFIRMATIVE DEFENSES.

- <u>"Failure to state a claim upon which relief can granted" and "lack of standing."</u>

Plaintiffs rely on their arguments at pp. 2-7 of their Response to Defendants' Motion for Partial Summary Judgment, Document #71. Because the corporate veil should be pierced, French stands in the shoes of the corporations and becomes jointly and severally liable for their breach of contract.

- <u>Defendants' affirmative defense that plaintiffs' claims may be barred by a superseding cause.</u>

Trafton and Brinkley rely on their arguments in part II of this Reply, *supra*, and pages 9-12 of their Response to Defendants' Motion for Summary Judgment, and

11

in their responses to Defendants' Proposed Findings of Fact 4 and 24 (Document #78).

## V. REPLY TO DEFENDANTS' RESPONSES TO THE PLAINTIFFS' PROPOSED STATEMENTS OF FACT.

A.  Responses to Trafton's Proposed Findings of Fact.

- PFOF 4

Whether Mr. French was CEO of Rocketplane Kistler for a portion of 2007 is immaterial. At all times he was the CEO and Chairman of the Board of the other corporations comprising or affiliated with the Company and the principal of French Properties, LLC, and has been holding these positions since Brinkley resigned in November 2007. There is no admissible evidence that anyone other than he made the decision not to make severance payments to Trafton.

The references to the record are all taken out of context or incorrect.

- PFOF 13

The defendants' response is without any factual or legal support. The termination of Mr. Trafton is more than "purported," it's proven, it's admitted. As George French testified during his deposition:

> Q    Well let's take a moment here. First paragraph says, "On August 22, 2007 you," meaning you, Mr. French, "contacted me by telephone and informed me that my employment with Rocketplane Kistler, Inc. was terminated effective on that day." See that?
>
> A    Yes.
>
> Q    Is that an accurate statement; isn't it?
>
> A    I believe I used the term "layoff" and we had to let some people go.

12

> Q  And a layoff is a form of termination; isn't that correct?
>
> A  Yeah.
>
> MS. HOOKER: I am just going to object to the extent you are asking for a legal conclusion.
>
> Q  In your mind, is there any difference under the contract, the employment agreement, between a termination and a layoff?
>
> MS. HOOKER: Same objection, but go ahead and answer.
>
> A  I don't know. I mean, the effect is the same. A layoff is, in my opinion, is letting somebody go. If you don't want to let them go necessarily. You want to bring them back, and if you have the money to bring them back, you'll probably bring them back. Termination is you're gone, but that's a fine line.

Rosen Second Supplemental Declaration, ¶ 7, Exhibit 6; French Deposition, 98:13-99:15. Whether Trafton refused an offer of reinstatement is immaterial, and under the circumstances that existed in 2007 entirely reasonable.

- PFOF 16

The disagreement with the Proposed Findings of Fact is not only without factual or legal support, part of the disagreement does not respond to the Proposed Findings of Fact. Further, it is undisputed that Mr. Brinkley who was the CEO of Rocketplane Kistler in August and September 2007 wanted to pay Mr. Trafton his deferred pay, that the Company had sufficient funds to pay the deferred salary, and only Mr. French prevented the Company from doing so. Brinkley Declaration, ¶ 25.

That defendants should argue that Trafton (and Brinkley as well) present no documentation or clear explanation of the "agreement" to defer salary is disingenuous at best, given the fact that plaintiffs have repeatedly asked that relevant documents be

13

produced and have been told by defendants that they don't have any more information than that which they produced and what they refer to as the "redwells." Defendants have produced no such "agreements."

- PFOF 18

See comments above in response to PFOF 16.

B    Responses to Brinkley's Proposed Findings of Fact

- PFOF 4

Whether Mr. French was CEO of Rocketplane Kistler for a portion of 2007 is immaterial. At all times he was the CEO and Chairman of the Board of the other corporations comprising or affiliated with the Company and the principal of French Properties, LLC, and has been holding these positions since Brinkley resigned in November 2007. There is no admissible evidence that anyone other than he made the decision not to make severance payments to Trafton.

The references to the record are all taken out of context or incorrect.

- PFOF 12 and 14

It is not clear with what the defendants disagree. The "good reason" is not claimed by Brinkley to be the financial deterioration of the Company. Mr. Dickman and Mr. Kiehnle were not members of the Board of Directors. See Trafton's and Brinkley's Response to Defendants' Motion for Summary Judgment, pp. 11-12, and the citations therein (Document #71).

- PFOF 15-17

Defendants do not provide any factual or legal support for any disagreement

14

with these Proposed Findings of Fact. Also, see the comments to the Responses to Trafton's Proposed Findings 16 and 18, above.

## IV. CONCLUSION

Plaintiffs' Motion for Partial Summary Judgment should be granted. Defendants have provided no specific facts to dispute that they breached Trafton's and Brinkley's employment agreements by failing and refusing to pay severance and deferred salaries, and in the case of Mr. Trafton his health insurance premiums. Further, they have provided no specific facts that would support a denial of the motion for summary judgment on the remaining affirmative defenses.

Respectfully submitted this 14th day of August, 2009.

THE ROSEN LAW FIRM

By: _____
Jon Howard Rosen, WSBA# 7543
Attorneys for Plaintiffs
705 2nd Avenue, Suite 1200
Seattle, WA 98104-1798
(P) 206/652-1464
(F) 206/652-4161
jhr@jonrosenlaw.com

DAVIS & KUELTHAU, S.C.

By: _____
Kathy L. Nusslock, Wisc. Bar #1014027
Daniel G. Vliet, Wisc. Bar #1010154
Attorneys for Plaintiffs
111 East Kilbourn Avenue, Suite 1400
Milwaukee, WI 53202
(P) 414/225-1447 (Nusslock)
(P) 414/225-1422 (Vliet)
(F) 414/278-3647 (Nusslock)
(F) 414/278-3622 (Vliet)
knusslock@dkattorneys.com
dvliet@dkattorneys.com