UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILBUR C. TRAFTON and
RANDOLPH BRINKLEY,

    Plaintiffs,

 v.               Case No. 08-C-99

ROCKETPLANE KISTLER, INC., et al.,

    Defendants.

**DECISION AND ORDER**

   This cases arises out of the 2006 resignations of Plaintiffs Wilbur Trafton and Randolph Brinkley from Rocketplane Kistler, Inc., a fledgling aerospace company primarily owned and operated by Defendant George French, a Wisconsin resident. Plaintiffs both assert that they are owed severance payments under their employment contracts, while the Defendants claim otherwise. Both sides have now moved for summary judgment. For the reasons given below, the Plaintiffs' motion will be granted in full, and the Defendants' motion is granted in part.

**I. Background**

   Wilbur Trafton is a retired Navy captain and Randolph Brinkley is a retired Marine colonel. Both men worked for NASA in significant capacities after their military careers. In 2004, the two assumed management of Kistler Aerospace Corporation, with Trafton as President and Brinkley as CEO. The company was having significant financial difficulties at the time, and ultimately its lead investor brought defendant George French into the company as a major shareholder. Kistler and

French's company, Rocketplane Limited, Inc., soon began merger talks with the idea of joining together to obtain a large contract from NASA. In June 2006, Trafton and Brinkley entered into employment contracts with Kistler and Rocketplane Limited, and they did so, according to the contracts, "based on the expectation that the [companies] will be awarded a substantial contract by NASA pursuant to its COTS [Commercial Orbital Transportation Services] initiative, and the further expectation that Kistler Aerospace Corporation and Rocketplane Limited, Inc. will be merged into a new entity." (Trafton Decl., Ex. 2 at 1.) Under the hoped-for contract, the companies would build a reusable launch vehicle capable of transporting cargo and humans to and from the International Space Station.

No one disputes that the two companies merged in October 2006, but they do dispute whether NASA ever awarded their company a "substantial contract." In August 2006, NASA did award a contract under the COTS program, but it did not immediately cut a check for the entire $200 million amount of the grant. Instead, NASA supplied an initial amount of $30 million and made the rest of the funding contingent on the company achieving certain production goals and obtaining substantial funding from other sources. That the funding would be parceled out over time was not a surprise: the production goals were set forth in the Space Act Agreement signed by George French on June 15, 2006, which was contemporaneous with Brinkley's signing of his employment agreement and prior to Trafton's signing. In any event, due to the souring economy and other reasons, the company failed to meet the contract's production and funding goals, and thus the company never received significant additional funding from NASA under the COTS contract. (Brinkley Decl., ¶ 21.) During the summer of 2007 some of the key outside investors balked and withdrew their funding from the venture, and the lack of funding forced the company to engage in

Case 1:08-cv-00099-WCG   Filed 03/03/10   Page 2 of 15   Document 87

cost savings measures and scramble to find funds elsewhere. These cost savings included the termination of several employees and salary deferrals for executives.

On August 22, 2007, George French called Trafton to tell him that Trafton and many of his staff were being let go. The next day, however, French called back and said that he had found additional funding and was rehiring Trafton. Trafton, however, declined to be rehired and in fact the same day he sent a letter of resignation to French and the board of directors. The letter stated that French's "purported termination" of Trafton constituted "good reason" for Trafton's subsequent resignation under the terms of his employment agreement, and the letter explained at length that a resignation for good reason triggered that agreement's severance obligations. (Trafton Decl., Ex. 3.)

Brinkley lasted another month, but according to him he was fighting a losing battle given the lack of outside funding, which caused continued cuts to key staff members, as well as a notice of default received from NASA. Brinkley submitted a notice of resignation on September 24, but he stayed another five weeks in an attempt to turn things around. He submitted a second notice of resignation on November 1, and his letter noted, like Trafton's, that severance payments were owed by the company because the resignation was for "good reason" under Brinkley's employment agreement. (Brinkley Decl., Ex. 5.) Neither Trafton nor Brinkley was awarded severance benefits, however, which would have amounted to a year's salary ($260,000 for Trafton; $357,500 for Brinkley), and both now claim they are owed not only their severance payments but also the salary they agreed to defer for several months leading up to their resignations. Additional details and applicable contractual provisions are set forth below.

3

**II. Analysis**

Summary judgment is proper if the court concludes that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Plaintiffs' motion seeks judgment as to all of the Defendants' affirmative defenses.[1] They also seek judgment as a matter of law on their claim for breach of contract. (They do not seek summary relief with respect to the complaint's two additional Washington statutory claims.) The Defendants' motion seeks dismissal of all claims against Defendant George French, as well as dismissal of the statutory claims as to all Defendants.

**A. Breach of Contract**

The centerpiece of this action is Plaintiffs' assertion that the Defendants breached the Plaintiffs' employment agreements when they failed to pay severance benefits.[2] I will consider each Plaintiff's circumstances separately.

**1. Wilbur Trafton**

Under the employment agreements both Plaintiffs signed in 2006, resignation for "good reason" triggers the company's liability to pay a year's salary as a severance payment. The agreement specifies what events will constitute good reason, and among these events is "any purported termination by the Company of Executive's employment other than as expressly permitted by this Agreement." (Trafton Decl., Ex. 2 at ¶ 5(d)(2)(f)). Under the agreement, "any

---

[1]I do not consider this aspect of Plaintiffs' motion separately. Typically affirmative defenses are merely raised in an answer in order to preserve the right to raise them later. As Defendants note, many of the affirmative defenses are no longer relevant. In addition, affirmative defenses, as such, are generally not independent grounds for judgment but are only considered in the context of the arguments the parties raise on the merits.

[2]By agreement of the parties, Washington law applies.

4

termination of Executive . . . shall be communicated by a notice of termination to Executive . . . [which] shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination." (*Id.* at ¶ 5(j)). Thus, because French fired Trafton over the phone (and presumably did not provide the details, etc., required by section 5(j) of the employment agreement), Trafton was terminated "other than as expressly permitted" by his employment agreement. As such, Trafton argues that he resigned for good reason.

Defendants do not take issue with Trafton's reading of the contract and concede that the failure to follow the contract's written notice procedures constituted "good reason" for his resignation. Instead, Defendants assert that the agreement's severance provisions were not triggered because the conditions precedent to the contract's enforceability had not yet been met. As alluded to earlier, Defendants argue that the company was never awarded a "substantial contract" by NASA, and that (in their view) was a condition precedent to any severance liability. They assert that "the parties intended severance benefits to hinge on the Company being funded by NASA in the amount of $200 million," and the contract's severance provisions did not kick in until that $200 million was received. (Dkt. # 66 at 7.) Because NASA only funded a small part of the total amount ($30 million), the company's severance obligation was not triggered.

Defendants cite two sections of the employment agreement in support of their view that severance obligations were not triggered until the company received the entire $200 million award. First, the preamble to the employment agreements indicates that "WHEREAS, Executive and the Company are entering into this Agreement based on the expectation that the Company will be awarded a substantial contract by NASA pursuant to the COTS initiative . . ." (*Id.* at 1.) Second,

5

Defendants note that the contracts contain a separate termination provision that applies in the event of a failure to obtain the COTS contract:

> In the event that the Company is not awarded a substantial contract (NASA Space Act agreement) of approximately $200 million under the NASA COTS initiative, the Company may terminate this Agreement as of December 31, 2006 and shall only be responsible for payment of Executive's Base Salary through December 31, 2006 . . . The Company shall have no further obligation to pay any compensation of any kind or severance payment of any kind . . .

(*Id.*, ¶ 5(h).)

These two provisions show, Defendants argue, that the right to severance was contingent on the company being awarded the entire $200 million contract, not just *part* of the contract. I disagree. Most obviously, the provision quoted above is a *termination* provision, not a resignation provision. Here, the Defendants have not disputed that both Plaintiffs resigned. Moreover, although the termination clause references the "$200 million" figure, it does not suggest that the *entire* amount of that award must be received by December 31, 2006. It merely allows the company an escape hatch if the contract is not "awarded" by that date, and it is a stretch of the English language to argue that the NASA contract was not awarded simply because the entire amount was not released immediately. In short, nothing about the termination provision suggests that the Plaintiffs' severance benefits could be withheld upon their resignations for good cause in 2007.

Similarly, the "whereas" clause does not create a condition precedent to the enforceability of the severance obligation. That recital merely explains why the parties are entering into the agreement in the first place, namely, "the expectation that the Company will be awarded a substantial contract." The fact that one of the "whereas" recitals sets forth both sides' expectations does not create some kind of condition precedent. It is well-established, moreover, that "whereas"

6

clauses exist merely to provide context and are not themselves part of the agreement. *Aramony v. United Way of America,* 254 F.3d 403, 413 (2d Cir. 2001) (noting that "[a]lthough a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document.") In fact, the logical extension of the Defendants' "condition precedent" argument is that the company would not have to honor *any* of the agreement's obligations or even pay any salary until the full $200 million contract was received. Such a reading is simply implausible. If the parties had truly intended to condition severance liability on receipt of the entire contract amount, they could easily have drafted a clause to that effect without relying on the vague expectations contained in a simple recital.

Fundamentally, the Defendants' position is based on an overly narrow interpretation of the term "awarded." In their current view, the COTS contract would not have been "awarded" until the entire amount of the funding was actually received and in the bank. Because this reading of "awarded" underlies their entire argument, it is worth more fully exploring why Defendants' current reading is wholly untenable and at odds with how the term was understood in the employment agreements. As already noted, the NASA contract contained certain milestones that the company had to meet in order to continue to receive funding, and the parties knew the contract would contain such milestones when they signed the employment agreements. But the Defendants gloss over the fact that the NASA contract contained no fewer than *thirty* different financial milestones, and these milestones extended into 2012.[3] Every few months, the company would have to achieve a certain

---

[3] The NASA agreement is found at Exhibit 4 to the Brinkley Declaration (Dkt. # 54) at p. 47-53 ("part 5" and "part 6" if accessed on the electronic docket).

7

goal – e.g., obtaining a round of financing, conducting a safety review, begin fabricating structural components – and if it did so then NASA would dole out another ten or fifteen million dollars. The final $10 million would be received in August 2012 if the company conducted a successful *manned space flight* to the International Space Station. Under the Defendants' view, the contract would not have been "awarded" until the company launched a man into space *six years* after the employment agreements were signed, meaning that Plaintiffs could work that entire span and then be fired on the eve of the final space launch without any severance liability. It is laughable to think the parties contemplated that the Plaintiffs, who were highly experienced and well-compensated executives, would work for six years before they were eligible for severance benefits.

But the Defendants' reading is not just an implausible interpretation of "awarded" – it is one that flies in the face of how the term is actually used in the agreements. Recall that § 5(h) ("Termination Because of a Failure to Obtain COTS Contract") allowed the company an escape hatch allowing it to terminate the executives without severance liability if the company failed to be "awarded" a substantial NASA contract as of December 31, 2006. Such a clause makes no sense under the Defendants' current reading of the term "awarded," because in their view the COTS contract could not have been "awarded" until the entire funding was received and all of the NASA milestones had been met in 2012. Obviously, if the NASA contract could not have been "awarded" until 2012, it would have made no sense for the parties to have drafted a termination clause addressing the possibility that the contract might not be awarded by the end of 2006. In Defendants' current view, the contract could *never* have been "awarded" by then. This would render § 5(h) meaningless because it would apply to a contingency that could never occur. Instead, the only reasonable way to resolve this problem is to assume that the parties used the term "awarded" in the

8

common sense usage Plaintiffs propose here – that the NASA contract was awarded when NASA selected their company and began the initial funding process. The Defendants' current belief that "awarded" meant the entire amount of the contract must be received is simply an opportunistic one at odds with how both sides used the term in the employment agreements.

For these reasons, I conclude that severance liability was not conditioned on the company receiving more money from NASA than it received. And even if it was conditioned on the COTS contract being "awarded" by NASA, that condition actually occurred because NASA did "award" the contract. Because Defendants have conceded Trafton's interpretation of the contract allowing him to resign for good reason, Trafton is entitled to summary judgment.

**2. Randolph Brinkley**

I have already concluded above that severance liability was not conditioned on the company's receipt of the entire $200 million contract from NASA. Accordingly, the only question remaining on Brinkley's contract claim is whether Brinkley resigned for "good reason." While Trafton resigned based on the company's failure to follow the employment agreement's notice procedures (a point the Defendants conceded), Brinkley cited other reasons for his own resignation, and the Defendants deny that his circumstances constituted good reason.

Brinkley cites three clauses that he believes allowed him to resign for good reason:

(b) A material diminution in Executive's duties or the assignment to him of duties that materially impair his ability to perform the duties normally assigned to the President and Chief Operating Officer of a corporation the size and nature of the Company . . .

(c) A reduction in Executive's then current base salary or in his targeted annual incentive compensation pursuant to Section 2(b) or a failure to pay any amounts to Executive hereunder when due . . .

9

> (e) The breach of the Company's obligations under Sections 2, 4 or 6 of this Agreement . . .

(Brinkley Decl., Dkt. # 54, Ex. 2, § 5(d)(2)).

Brinkley asserts that he was materially impaired in his ability to perform his duties as President, constituting "good reason" under § (b) above, when the company fired multiple senior staff members, including Trafton, and mandated strict cost-cutting procedures. Although that might ultimately be shown to be good reason, Brinkley's argument is generally not the sort of claim that can be resolved on summary judgment. Assessment of such a claim would require, for example, sorting out factual disputes as to how "impaired" Brinkley's job became, and whether the impairments were "material."

But Brinkley also argues that one of his "good reasons" was the fact that his salary was deferred during the summer and fall of 2007 and the company declined or ignored his requests to be paid. Not surprisingly, his employment agreement deems it "good reason" to resign if there is a "failure to pay any amounts to Executive hereunder when due." *Id.* § (c). The agreement requires that the executive "shall receive the full pro rata monthly amount of his Base Salary unless earlier terminated . . ." and such amounts were to be "payable in accordance with the Company's normal payroll practices." (*Id.*, § 2(a).) Thus, the failure to pay an executive on a timely basis would constitute a failure to pay an amount "when due." Brinkley did not receive any salary in June, July, August and September of 2007, and Defendants do not contest that. Instead, Defendants vaguely argue that Brinkley has presented no evidence of the "terms" of his agreement to accept a deferred salary for those months, but that is beside the point. Once the company failed to pay him his salary "when due," that constituted "good reason" to resign. The fact that he held on for a few more

10

months in an effort to turn things around does not change anything. Whether there was some formal or informal deferral agreement with "terms" is immaterial unless Brinkley explicitly waived his right to resign for good reason, but there is no evidence of that and no reason why he would do so. Accordingly, Brinkley is entitled to summary judgment because the company's failure to pay his salary at the proper time gave him "good reason" to resign.

**B. Other State Law Claims**

Defendants have moved for summary judgment on Plaintiffs' other state law claims. Under Washington state law, an employee may be entitled to double damages plus attorney's fees if the employer withholds owed wages "wilfully." Wash. Stat. § 49.52.050. Defendants assert that there was (and is) a genuine dispute about the company's liability to pay the severance benefits owed to Trafton and Brinkley, and the *bona fide* nature of that dispute precludes, as a matter of law, any judgment that the company's failure to pay was "willful."

> An employer is guilty of a misdemeanor under RCW 49.52.050, and liable for double damages under RCW 49.52.070, if the employer willfully and with intent to deprive withholds wages the employer is obligated to pay. Whether an employer's withholding is willful is ordinarily a question of fact. But summary judgment is nonetheless appropriate if there is no dispute as to the material facts. An employer's failure to pay wages is willful if it is volitional, i.e., not a matter of mere carelessness but the result of knowing and intentional action. If there is a bona fide dispute regarding the payment of wages, the failure to pay them is not willful.

*Byrd v. Barmor Temporaries, Inc.,* 2010 WL 165083, *3 (Wash. Ct. App. 2010) (citations omitted).

As for Brinkley, the company has admitted that it failed to pay the salary it was obligated to pay. It is difficult to see how that could constitute a "bona fide dispute" about the payment of wages. And as for the severance payments to both Plaintiffs, I have rejected the Defendants' arguments and consider them to be not just unpersuasive but borderline frivolous. An employer

11

cannot defend a lawsuit with frivolous or baseless arguments and then point to its defense of the lawsuit as evidence that there was a "bona fide" dispute. Not all legal defenses are based on good faith, and in fact one reasonable explanation for Defendants' defense of this lawsuit is that it was trying to manufacture a bona fide dispute so as to avoid double damages. But that is not presently before me. It will suffice to say that Defendants are certainly not entitled to summary judgment on the statutory claims merely because they have cobbled together a few arguments and filed paperwork defending a federal lawsuit. Their motion will therefore be denied.

**C. Claims Against George French**

Defendants have also moved for dismissal of all claims against George French on the grounds that the employment agreements were entered into between the Plaintiffs and the Kistler and Rocketplane companies, not French personally. Plaintiffs argue that French should remain a party because there are facts that would warrant a piercing of the corporate veil.

> Piercing the corporate veil is an equitable remedy imposed to rectify an abuse of the corporate privilege. In general, a corporation is considered a separate entity, even if it is owned by a single shareholder. To pierce the corporate veil, two separate, essential factors must be established. "First, the corporate form must be intentionally used to violate or evade a duty." Second, the fact finder must establish that disregarding the corporate veil is necessary and required to prevent an unjustified loss to the injured party.

*Dickens v. Alliance Analytical Laboratories, LLC* 127, 111 P.3d 889, 892 (Wash. Ct. App. 2005).

The facts Plaintiffs point to do not create a veil-piercing issue. First, they cite the fact that the companies' attorney, Ragan Powers, felt obligated in 2007 to inform the board of directors that he believed George French was trying to obtain more favorable terms for a bridge loan he had made to the company earlier that year. In Powers' letter to the Board, which is dated September 20, 2007, he stated that he was concerned that French might be attempting to memorialize the loan agreement

12

on more favorable terms than the loan was originally negotiated. (Dkt. # 72, Ex. 2.) In particular, Powers believed French was trying to obtain security interests in the company's patents even though that had not been a part of the original deal. Powers felt obliged to bring this to the Board's attention so they could consider whether such terms were appropriate.

Even if Powers was right that French might have been trying to get a security interest in more than he originally bargained for, this would not establish the sort of disregard of the corporate form that is required to pierce the corporate veil. First, there is no evidence that French actually obtained the security interest that Powers believed he was not entitled to. But even if he did, at worst it is suggestive of self-dealing between a company and its CEO. Although that could constitute a breach of French's fiduciary duties and might justify an independent claim by the stockholders against French, it has nothing to do with any abuse of the corporate *form*. To pierce the veil, "the corporate form must be intentionally used to violate or evade a duty." *Dickens,* 111 P.3d at 892. Even if we believe the worst, all it suggests is that French was trying to get a better deal for himself at the expense of the stockholders – he was not trying to use the corporate form to avoid any obligations to anyone or cause any other injury. A single allegation of self-dealing does not create an issue of veil-piercing.

Plaintiffs also note that French was the controlling force behind the company, and they further observe that he operated numerous LLCs. Even so, power and ownership of multiple entities are generally irrelevant to the veil-piercing analysis. To cite just one well-known example, the investor Warren Buffet exercises tremendous control over Berkshire Hathaway, a holding company that owns numerous other companies, but that does not mean his own personal assets are on the line in all of those companies' dealings with their executives. There is nothing inequitable *per se* about

13

owning multiple companies and using liability-shielding vehicles like LLCs or C corporations to do so. (Shielding oneself from personal liability is, in fact, the *point* of doing so.) Accordingly, the mere fact that French owned the company and exercised control as its CEO does not make him personally liable for the company's debts, nor does the fact that he may have owned other entities with limited liability.

What's missing from Plaintiffs' veil-piercing argument are any suggestions that the company was deliberately underfunded or that French was trying to use the corporate form to evade any duties or commit fraud. Instead, the facts suggest that the company simply ran out of money and failed to meet NASA's financial benchmarks after the economy soured and funding dried up. That, in itself, does not justify veil-piercing.

For the same reasons, there is no evidence that French could be considered an "employer" under Wash. Stat. § 49.48.010. (The briefs seem to be arguing at cross-purposes, and it is unclear whether Plaintiffs are actually alleging that he is.) That statute states that "[w]hen any employee shall cease to work for an employer, whether by discharge or by voluntary withdrawal, the wages due him on account of his employment shall be paid to him at the end of the established pay period . . ." The Plaintiffs' employer was Rocketplane Kistler, Inc., not George French. To bring a claim against French personally, they would have to pierce the corporate veil, and as noted above there is no basis in the evidence to do so. Accordingly, to the extent there is any § 49.48.010 claim brought against French, it will be dismissed.

This result does not preclude Plaintiffs from asserting claims against French for violations of RCW § 49.52.070, however. That statute creates liability for officers and agents, not just "employers," and there is no question that French would qualify as the CEO. "[L]iability under

14

RCW 49.52.070 does not turn on piercing the corporate veil." *Durand v. HIMC Corp.,* 214 P.3d 189, 199 (Wash. Ct. App. 2009) ("Because Johnston and Cornwell each exercised control over the direct payment of funds and acted under that authority by refusing to pay Durand, the trial court did not err in finding them personally liable under RCW 49.52.070."). Accordingly, the § 49.52.070 claim against French will not be dismissed.

## III. Conclusion

For the reasons given above, the Plaintiffs' motion for partial summary judgment on the breach of contract claims is **GRANTED**.[4] The Defendants' motion for summary judgment is **GRANTED** in part, to the extent that breach of contract claims against George French are **DISMISSED**, as are any claims brought against French under Washington Statute § 49.48.010. The clerk will contact the parties to arrange a scheduling conference on the remaining statutory claims.

**SO ORDERED** this ___3rd___ day of March, 2010.

                                                          s/ William C. Griesbach
                                                          William C. Griesbach
                                                          United States District Judge

---

[4] It is not clear which Defendants Plaintiffs are seeking judgment against.